997 Cajun Services Unlimited v. Benton Energy Service Company. Mr. Ricci, whenever you're ready. Did I mispronounce your name? That is absolutely correct, Your Honor, and good morning and may it please the Court. This is Devin Ricci with Keene Miller on behalf of Appellant Benton Energy Services Company, better known as BESCO, throughout the briefing. May I proceed? Please do. Your Honors, unless there are any specific questions, I would like to highlight four areas of clear factual and legal issues relating to patent, breach of contract, trade secrets, and damages. Hearing no questions, I'll turn first to the issue of patent. As Your Honors have seen from the briefing, the 862 patent requires two sets of rollers in every single claim. Additionally, these rollers must have specific attributes and configurations. It is not disputed on the record that BESCO removed its second lower set of rollers before the patent issue. Instead, BESCO redesigned its elevators, which effectively is like a clamp, Your Honors, to use static padding in the lower region. It is also further shown in the evidence in the record that within a month, the pads were also removed entirely and the elevators were used with nothing in the lower region. Therefore, Your Honor, we submit that no reasonable jury could find that the pads were the equivalent of the rollers. Do I remember correctly that there was not a motion for JAMAL on this issue? That is correct, Your Honor. We are seeking a new trial on the issue of patent. So, you stated the standard for JAMAL. You said no reasonable jury could find, but that's not the standard, right? Isn't the standard under the Fifth Circuit whether there's an absolute absence of evidence? Your Honor is absolutely correct, and I do apologize for misstating the standard. Regardless, Your Honor, I would still submit that there is an absolute lack of evidence supporting a finding under the doctrine of equivalence here. Can I ask you about that third design where there's removal of the Teflon pads? I understand that the jury heard evidence that this redesign doesn't actually exist. Aren't we supposed to presume that the jury found all factual issues not in your client's favor when there's a jury verdict? Your Honor, I think what ended up happening there is a shifting of the burden. I believe the only evidence of the record that is present regarding this third accused design demonstrates that the company, the client for whom BESCO is performing the services, requested that the actual rollers be removed, and there's a job log noting that the rollers, in fact, were removed. I believe the actual burden at trial would have been on the plaintiff, Kagan, at all to show that BESCO is continuing to use the pads beyond the one-month period of time. Regardless, Your Honor, I would still submit that the pads, whether they are there or not, still do not perform the same function or work in the same manner as the required rollers. You don't object to the jury instruction on doctrine of equivalence, correct? That is correct, Your Honor. We do not object to the jury instruction. So the jury was properly charged. The jury had all this evidence before it, and the jury just simply disagreed with you. Isn't that right? Your Honor, I think that's exactly why we're here on appeal, is that all of the evidence certainly shows that a static pad, a static pad that was used simply to prevent metal-to-metal roller. But the judge went through and pointed out evidence. He said, you know, there was evidence on both sides, but that's not the trial judge's role, and it's not our role. It's the jury's role to decide what that conflicting evidence really shows. Your Honor, you'll also note in the briefing, however, that there was an objection to the doctrine of equivalence. Over Besco's objection, the judge qualified Bryce Randall as a lay expert witness and instructed Mr. Randall to only provide testimony on matters within his personal knowledge. Nevertheless, and again over Besco's continued objection, Mr. Randall actually provided testimony as the ultimate conclusion here, despite the fact that he admitted he had never seen the trial and never saw it in operation. I think the issue here is that this conclusory testimony by a lay expert witness who was unqualified to provide it, not a 702 expert, was ultimately prejudicial to Besco's position. Well, let me ask you, this is Judge Prost. On that question of prejudicial, I couldn't see, I don't recall in the blue brief, and you were supposed to show that it was prejudicial, right? That's your burden. And I don't recall that argument being developed or made in half in the blue brief. So can you point me to anything I'm missing? Your Honor, I admit I am having a slight trouble bringing up the blue brief right now. I do know that we certainly cited it extensively in the gray brief in the reply. Yeah, but we, well, okay, if that's all you have is the gray brief, you can give it to us. But I'm a little more interested in the blue brief because that's where it probably should have been. Your Honor, I would also submit that this was the only testimony provided in support of the Doctrine of Equivalence. And Your Honor, if I may, and not to jump on the issue, if I can come back on rebuttal, I would be happy to point you to it. That would be fine. Your Honor, at that point, I would also like to switch gears to the briefs of contract. Again here, and Your Honor, the gray is page 42 of the brief. Regarding briefs of contract, I think we've also shown that the District Court committed an abuse of discretion in finding that Apelli properly relied upon the Louisiana law. As we argue in our brief, the Louisiana law, as mandated by the Louisiana Supreme Court in Boullios v. Morrison, expressly holds that a third party seeking to benefit from this doctrine of apparent authority may not blindly rely upon the assertions of an agent. Rather, he has a duty to inquire into the nature and extent of the agent's power. Here, there's no question that... But what about apparent authority? I mean, didn't the court make specific findings that the jury reasonably could have found apparent authority? Your Honor, that's exactly the issue here. The Boullios Court, Louisiana Supreme Court, said that a party has an express duty to inquire as to an agent's authority. Here, Shane Trish, the principal, testified on Appendix 605. Again, I don't know what authority the guy coming to sign the document has. When pressed further, Trish expressly admitted, we never asked to see who had authority to sign the terms and conditions. Louisiana Court in Boullios... Well, I've read Boullios too, and it seems to me that the duty to inquire isn't a blanket rule. It depends on the circumstances. The quote from Boullios is, the facts and circumstances should have caused plaintiffs to question the agent's alleged authority in good faith. And I'm having a hard time here seeing why the jury could not have said that Cajun... Why Cajun should have felt the need to inquire about the exact scope of authority of someone who did have the authority to sign for delivery of the equipment. Sure, Your Honor. A couple of things. First and foremost, I was going to talk about this in regards to trade secrets, but I think the actual structure of how the terms and conditions came into existence, a merit discussion here. First, the initial rental tickets, as you will, that these hotshot drivers, the field hands, were sent to go pick up the rollers, did not have any terms and conditions. For several months, these tickets went back and forth. For several months, a website link was finally introduced to the terms and conditions, but they never inquired as to whether or not these field hands were accessing the computer on site in order to be able to review the terms and conditions. But the tickets ultimately, counsel, the tickets ultimately did have the terms and conditions on them, and there were repeated times in which the equipment was accepted and the rental were paid. And at that point, they had the terms and conditions in writing. Right? Your Honor, that would have been about a year and a half into this entire process and into the relationship between the parties. I also note, I believe it's on page 605 of the appendix, excuse me, Shane Trist testifying, we did not go directly to Esco or to Jamie or Esco personally and ask them to please read our terms and conditions. No, we did not. Under Louisiana law, it's generally only reasonable for the members and member managers of an LLC to bind the company. Here, the field hands that were sent over to pick up these tools were never part of the members or member managers. Well, wait a minute, Mr. Matt, this is Judge Prost. You rely on a provision in the delivery ticket stating, quote, no field employee of the company shall be empowered to alter the term. So I have two questions. Firstly, does company in this context refer to Cajun or Besco? Your Honor, under the definition, it is in fact referring to Cajun. However, to the extent that Cajun is putting others on notice that field hands have no authority, I think it suits their own purposes to know that our field hands would have had no authority as well. Okay, well that's a potential, but let me ask you the second part of the question. Regardless of that, how does that show that Besco's field employees lacked authority to accept the term given to them? It only speaks to their power to alter the term, suggesting that they don't have the power to alter, but they have the power to, the authority to implement the terms as they exist. Sure, Your Honor. If I may answer in the time allotted, I think the answer there is simply that because the actual field hands never had actual authority under Louisiana law, the only way that this would have been in quote reasonable is for Cajun to have actually asked the extent to, fulfilled their duty to inquire as to the authority. Courts, since Bullios have continuously held that a company or an individual that seeks to rely upon a parent authority, but fails in its duty to inquire, does so at its own peril. All right, why don't we, if there are no further questions from the panel, why don't we hear from Mr. Scott? Thank you, Your Honors. Hello, Your Honors. I'm George Scott for the appellees. Thank you for your time today. May it please the court. Please proceed. Thank you. I'd like to start with, so first and foremost, this is really a trade secret fraud and breach of contract case more than it is a patent infringement case. Certainly there is a patent infringement claim, but the focus of the evidence and the focus of the relationship really steers this towards being a trade secret fraud and breach of contract case. So I'd like to start with those claims, unless Your Honors have any specific questions about the briefing or Mr. Ricci's argument. Yeah, I do have, this is Judge Prost. I do have a question about Mr. Randall's testimony, because we do have a case law that talks about inadmissibility of lay opinion testimony on technical questions involving patents. I know the district court I think did a pretty good job or a good job in sort of shepherding this along, recognizing the pitfalls. But why isn't this a problem, particularly your friend said, I guess he was correct, that this was the only testimony on the DOE question? Well, first and foremost, I would say that it shouldn't be dispositive here, because as we mentioned in the briefing, the admissions from BESCO and the testimony of the other witnesses actually, including BESCO's expert and BESCO's principal, Esko Benton, actually established that the filler pads did function in the same, you know, did perform the same function way and result as the lower rollers, before even considering Mr. Randall's testimony. But more than that, it's that Mr. Randall is, and I know one of the cases that BESCO is cited to is the oxygen frog case, I believe is what it is. Yes, oxygen frog. It's a very different case than what happened there. Mr. Randall was disclosed at the time that BESCO in the 26A2 expert disclosures, as an expert that was going to testify on technical matters, including the doctrine of equivalence, he was disclosed in all the witness disclosures as someone who's going to make those disclosures. And BESCO simply never objected, not even by the deadline to challenge expert testimony. And so when Mr. Randall showed up at the trial, that was the first time that we ever received a challenge from BESCO to his testimony. And what Judge Ash, the district court judge did, was he qualified him as a lay opinion expert witness, based on having 20 years of experience in the field, and having the personal knowledge. And he was not qualified as a 702 witness, right? He was not. I'll just say that, yes. He was not qualified as a 702 witness. That's what we asked for, but he was not. And so he was not- And the judge typically told him not to opine on the ultimate issue. Isn't that right? Correct. And I would submit that he did not opine on the actual ultimate issue of the filler path function in the same way, or with the same function, or the same result. And instead, what he opined about was things that were within his personal knowledge, which is how Cajun's tool operates, which he was intimately familiar with, and how the function and the way and the result that the lower rollers performed in Cajun's tool. And then the jury could combine that with BESCO's own material that it selected, and the reasons it admitted it selected that material for, including the testimony of its expert, that made it very clear to the jury that the material was selected in order to, because of its friction-reducing properties, so that the filler pad would function in the exact same way as the lower rollers in order to reduce function. This is Judge Prowse. I assume also that the jury was presented with certain exhibits so they could see what you were talking about here? Yes, Your Honor. So, there was, in front of the jury for most of the trial, there were, these tools are, you know, without the rollers in them are roughly 75 pounds apiece, and these inserts were on the table in front of them. So, they saw Cajun's insert sitting next to BESCO's insert. They were allowed to see the rollers from both of the companies, and the filler pad was also in front of the jury at certain times of the trial. And I believe, I'll add, I believe at some point in time in the trial, the jury was allowed to actually touch the tools as well. Not that it was absolutely necessary, given the visual similarities of the tools, but there were no restrictions on the jury's access to the Now, this is Judge Prowse again. Could you respond to your friend's arguments reciting Louisiana law on the duty to inquire and the apparent authority, et cetera? He cited Louisiana case law. So, can you respond to that? Yes, Your Honor. And I can't remember exactly who had noted that the Louisiana law requires the duty to inquire under certain circumstances where a reasonable person would actually have some doubt. And I think Your Honors have it exactly right. In this situation, there really wasn't any reason for Cajun to doubt whether or not there was authority. And let me jump back for just a second and say, I don't even think that a finding of apparent authority is necessary to an affirmative breach of contract. Because what we have from BESCO is an actual request for admission response, an actual factual admission that BESCO admits that it specifically sent its employees to Cajun's shop to sign that agreement. That's an admission they made in the case. They just simply have this bizarre... I'm sorry, Your Honor. Go ahead. It wasn't Mr. Lovell also aware of the terms and conditions? Oh, absolutely, Your Honor. I mean, I know that BESCO's position is that Mr. Lovell didn't sign the agreement, Esco Benton did not assign the agreement, and that there's no proof that Mr. Lovell actually read their emails in the three to four times that the agreements were sent directly to them. But there's certainly no dispute that Mr. Benton and Mr. Lovell did in fact receive that agreement on three to four separate occasions. And I think the jury was reasonable in rejecting the concept that they never read it. I understand it, counsel. Wasn't there testimony? I'm looking at JA 1053. Isn't there testimony that Mr. Lovell was actually alerted to the fact that the terms and conditions were listed when he accepted the tickets? I believe that's actually in reference to Lee LeBlanc. And like most of the names in this case, I do butcher the pronunciation a little bit. But that was, I believe, in reference to Lee LeBlanc, who is an offshore supervisor and effectively, you know, the third in command. It mentions Mr. Lovell and the fact that he was the operations manager. I'm turning to that right now. Your Honor, I would say that Mr. Lovell was certainly aware. You know, I think the evidence showed that Mr. Lovell was certainly aware that there was a rental agreement and that there were terms on the back. And as I was saying... I'm just talking about what the testimony was and that the jury had the right to consider. I'm looking for the specific... I'm sorry, Your Honor, I am not finding... On 1052 of the appendix, there's testimony that says when Mr. Lovell came in the office, I was there, I grabbed it, I grabbed the ticket and told him, you know, I told him the agreement's on the back. You need to read it and sign the ticket. Right? So, Your Honor, I believe, looking at line three and four of that particular page of testimony, appendix 1052, I do think, as much as I wish it said what you are suggesting, and I hope it does, I do believe that that testimony is in regards to Lee LeBlanc. Okay. Counsel, I just want to ask you a question. I mean, just to make sure I understand this, the jury was also instructed on ratification, right? And there was occasion to present evidence to the jury that BESCO ratified the contract, right? And that could be an independent basis for the jury's finding. Is that correct? Yes, Your Honor. I certainly believe that ratification, apparent authority, and express authorization are all three independent bases for finding that the jury could have found this contract was agreed to under, based on BESCO's own admission, you know, the fact that it was completely reasonable for Cajun's employees to believe that Esco Benton himself sent his employees there to sign to pick up the tools. And then, you know, that it's just, you know, the jury had every right to reject this concept that Mr. Benton never opened his emails and never found out about this rental agreement until this lawsuit was filed in January of 2017. And he certainly continued using the tools in early 2016 until BESCO finally ceased its relationship with plaintiffs. And, you know, and the evidence is that it all happened during the exact time that the trade secret misappropriation was happening. So we believe the jury found it was very clear as to exactly why these agreements were signed with a complete disregard as to what was actually in them. Because frankly, there was never any concern as to what was in them because BESCO really never felt that any of this would become public knowledge or that it would get caught. If your honors don't have any additional questions on breach of contract, you know, I won't get another chance to go back to trade secret misappropriation. And I would like to address a few points that are raised in BESCO's gray brief, their reply brief. During the trial and then again in BESCO's opening brief, there was an attempt by BESCO to focus on the trade secrets being just simply the fact that there were rollers on the inside of the inserts. And the reasons that they tried to do that and which the jury rejected is that if the actual trade secrets that plaintiffs claim, the internal makeup and configuration of the internal components of the rollers, once that's considered, BESCO's arguments tend to fall apart. And so now in the reply brief at pages 12 to 13, BESCO is finally focusing on the trade secrets that plaintiffs actually are claiming, which is the internal components. What is the trade secret? So, the rollers are comprised of internal components. They're a proprietary configuration of specific types of bearings that have to be placed in there in a particular configuration. So, it's the types of bearings and the way that they're configured in there. And while certainly somebody could build an heiress tool reading just the patent specification and they know, just like anyone knows, that a roller has to have bearings inside of it. The reason why Cajun's tool performed so well was the hundreds if not thousands of hours of testing and development that Cajun, in particular, Shane and Heath Trish, put into developing the perfect combination of rollers and bearings based on the various different weights and types and sizes of tubular. And this, the evidence showed, is specifically what BESCO was disassembling and analyzing in its shop when a third-party independent investigator walked into the shop and noticed that something was wrong. This is separate and distinct then from what the patent has claimed? Yes, Your Honor. So, the patent claims an elevator roller insert system. But the plaintiffs have kept as trade secret their proprietary configuration of rollers and bearings that they use inside those rollers. You can certainly practice the patent without using that proprietary configuration. But we believe that the evidence showed that not only did BESCO copy the tool itself, but it also used improper means to access that proprietary combination and make up on the inside so that its tool, its knockoff tool, would work as well as the tool that it was replacing because that's exactly what its offshore operator client expected to have Your Honors, if I could have just another minute or two possibly to address the specific arguments against those trade secrets, I'd appreciate it. But if not, I would rest on the groups. Well, only if my colleagues have further questions about that. Thank you, Your Honor. Hearing none, thank you. Mr. Ricci? Hi, Your Honor. Yes, I would like to also address the trade secret issues as I did not get to them in my case in Chief. One thing that the jury was also shown, and by the way, the reasonableness of secrecy here is a de novo review as there was a judgment as a matter of law. The jury was presented with weeks and months of emails and correspondence well predating any kind of rental agreement or ticket from Cajun to BESCO disclosing specific schematics and drawings of all of the components of the alleged heiress system. And I'll quote one of them from page 788 of the appendix, and this is Shane Trish sending an email. Here's a couple of 3D images of the roller dyes. One of them is transparent so you can see all of the components. Now, at this point in time, none of these drawings had ever been marked as confidential. There was no nondisclosure agreement in place. There was simply a free flow of technology transfer and discussion about these products. Now, we challenged the sufficiency of the reasonableness on the basis that Cajun, excuse me, had given technology to numerous third parties and never did anything to evidence that they were actually treating this information as trade secret. In denying our motion, the court first pointed to the appellees applying for patent protection prior to testing the unit. Counsel, I have a quick question for you. This is Judge Stahl. Quick question. Absolutely. You had said at the beginning of this, you said that because you moved for JML, it was a legal question here on whether Cajun took reasonable measures to maintain the secrecy of its trade secrets. Now, just to clarify, that's a fact issue for the jury, right? And on JML, we review it for substantial evidence, right? That is correct, Your Honor. And here, I think what the district court and the jury ended up doing is substituting the standard by equating some measures to reasonable measures. And here, the evidence of the appellee shared its alleged proprietary information with numerous third parties, BESCO, CRO, the testing company. Counsel, don't we have to assume that the jury followed the jury instructions that they were given with respect to what needed to be shown? You can assume that to some extent, Your Honor, but I believe the jury would have abused its discretion in ignoring the numerous times that this technology was disclosed without any kind of confidentiality. If I may continue, Your Honor, I appreciate the opportunity to finish the answer. Yes, just make it quick, please. Absolutely. I think, Your Honor, what we have here is a patent that teaches persons having ordinary skill in the art how to make and use the error system. We have a complete disclosure of detailed and before there was any kind of restriction. We have rental agreements that have no confidentiality obligations, and in fact, BESCO was encouraged to show the errors to companies like Anandarco and the contractors on board. We have a complete lack of confidentiality throughout, and this was even before the first rental ticket came into place. While the jury was provided with all of this evidence, it seems as though they got carried away and ended up ignoring the unrebuttable evidence. Thank you. We thank both sides, and the case is submitted.